UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

        v.

TAJ WILLIAMS,

                        Defendant.

_____

REPORT & RECOMMENDATION

16-CR-6014W

## PRELIMINARY STATEMENT

By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated February 11, 2016, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 18).

Defendant Taj Williams ("Williams") has been charged in a three-count indictment with three offenses that allegedly occurred on January 18, 2015. (Docket # 17). Count One charges Williams with damaging and destroying by fire a building located at 989 Chili Avenue, Rochester, New York, in violation of 18 U.S.C. § 844(i). (*Id.*). Count Two charges him with possession of three Molotov cocktails, in violation of 26 U.S.C. §§ 5822, 5845(a)(8), 5845(f), 5845(i), 5861(c) and 5871. (*Id.*). The final count charges Williams with possession of three Molotov cocktails that were not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5845(a)(8), 5845(f), 5861(d) and 5871. (*Id.*).

Currently pending before this Court for report and recommendation are Williams's motions to suppress statements and physical evidence.[1]  (Docket ## 24, 34).  For the reasons discussed below, I recommend that the district court deny Williams's motion to suppress statements.  As to Williams's motion to suppress physical evidence, a further evidentiary hearing shall be conducted.

## FACTUAL BACKGROUND

### I.    Search Warrant for 2004 Chevrolet Trailblazer SUV

On January 20, 2015, Monroe County Court Judge John L. DeMarco signed a warrant authorizing the search of a white 2004 Chevrolet Trailblazer SUV with a black hood and VIN number 1GNDT13S442321729 registered to Vanessa A. Blandino.  (Docket # 24 at 18-19).  Judge DeMarco determined that probable cause existed to believe that the vehicle contained evidence of arson in the first degree under N.Y. Penal Law Section 150.20(1a).  (*Id.*).  The warrant authorized the search of the vehicle for, *inter alia*, ignitable materials.  (*Id.*).  Andrew MacKenzie ("MacKenzie"), an investigator employed by the Rochester Police Department ("RPD"), submitted an affidavit in support of the application for the warrant.  (*Id.* at 20-26).

In his affidavit, MacKenzie indicated that he was involved in an investigation of a fire that occurred on January 18, 2015, at approximately 3:24 a.m., at 989 Chili Avenue, Rochester, New York.  (*Id.* at ¶ 6).  According to MacKenzie, RPD officers responded to a report of the activation of a burglar alarm at that location and discovered that the building was on fire.  (*Id.*).  The subsequent investigation revealed that the fire was incendiary in nature.  (*Id.*).

---

[1]  Williams's omnibus motion also sought, *inter alia*, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 24).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on May 18, 2016.  (Docket ## 27, 28).

According to MacKenzie, surveillance footage from the store revealed the presence in the vicinity of the building of a white Trailblazer with a black hood and a missing gas door on the driver's side. (*Id.*). MacKenzie stated that the footage depicted the vehicle pass the building twice; after the second time, a male approached the front of the building from the south on Westfield Street, the direction in which the vehicle had been traveling. (*Id.*). According to MacKenzie, the male, who was carrying a plastic bag, broke the window of the building's front door with a pipe, lit and threw two Molotov cocktails into the building, and then ran in the direction from which he had come. (*Id.*). A few seconds later, the male returned to the front of the store, retrieved a third Molotov cocktail from the bag, and threw it into the store without lighting it. (*Id.*). The male took the bag and pipe and ran south on Westfield Street. (*Id.*).

MacKenzie's affidavit stated that Arson Task Force Investigator Dorrer recalled another open arson investigation involving a fire that had occurred at the same location on November 5, 2012. (*Id.*). According to MacKenzie, at the time of that fire, two males approached the front of the store, broke a window, and threw Molotov cocktails into the store. (*Id.*). A Toyota Four Runner was observed traveling south on Westfield Street before the fire. (*Id.*). During the investigation of that arson, a confidential source identified the suspects and the vehicle involved in the incident. (*Id.*). According to the source, the vehicle belonged to Vanessa Blandino ("Blandino"), and one of the individuals involved in the fire was her boyfriend. (*Id.*). MacKenzie's affidavit stated that research revealed that Blandino "was involved with Taj R. Williams." (*Id.*).

Dorrer also recalled that Blandino had sold her Toyota Four Runner and had purchased a Chevy Trailblazer. (*Id.*). MacKenzie investigated the license plate number of the

vehicle depicted in the January 18, 2015, surveillance footage and discovered an RPD field information report dated March 2, 2014, relating to the vehicle. (*Id.*). According to the report, Williams was a passenger in the vehicle at that time, and the report noted that the vehicle was "missing the gas cap" and had a damaged front end. (*Id.*). Based upon the similarities between the two investigations, MacKenzie and Dorrer went to 140 Hazelwood Terrace, Blandino's address on the vehicle's registration, in order to try to locate the vehicle. (*Id.*). The vehicle was observed parked in the driveway of 140 Hazelwood Terrace, and MacKenzie observed that it was missing the gas door on the driver's side. (*Id.*).

At approximately 3:25 p.m., MacKenzie saw the vehicle leave Hazelwood Terrace. (*Id.*). A traffic stop was conducted; Williams was driving the vehicle and did not have a valid license. (*Id.*). MacKenzie observed that the vehicle had a black hood and was missing the gas door. (*Id.*). During a "cursory inventory search" of the vehicle, a small red gas can was observed in the rear cargo area of the vehicle. (*Id.*). Williams was arrested for aggravated unlawful operation of a vehicle in the first degree and transported to the Public Safety Building, where he was interviewed. (*Id.*).

MacKenzie's affidavit described the interview. (*Id.*). According to MacKenzie, Williams initially stated that he had been at 140 Hazelwood Terrace all night. (*Id.*). He then altered his story and stated that he had assisted his cousin in delivering newspapers. (*Id.*). Eventually, Williams stated that he had been at his brother's house and had given an unknown male a ride. (*Id.*). During the ride, Williams ran out of gas in the vicinity of Chili Avenue and Fillmore Street. (*Id.*). According to MacKenzie, Williams indicated that he then walked to a friend's house on Garfield Street, retrieved a gas can, and called a taxi, which transported him to a gas station on West Main Street and Reynolds Street and then back to his vehicle. (*Id.*).

4

Williams reported that he continued to be low on gas and drove his vehicle to a gas station on

Brooks Avenue and Genesee Park Boulevard, where he purchased more gas.  (*Id.*).  At the

unknown male's direction, he then drove to an area adjacent to an auto store in the area of Chili

Avenue and Westfield Street.  (*Id.*).  According to Williams, the unknown male exited the

vehicle carrying a backpack and walked towards Chili Avenue.  (*Id.*).  The male returned a short

time later, and Williams transported him to the area of Rosalind and Thurston Road.  (*Id.*).

Williams believed that the man's name was "Jay," but claimed to be unable to provide more than

a general description of his physical characteristics.  (*Id.*).


## II.   Interview of Williams

This Court conducted an evidentiary hearing on Williams's motion to suppress

statements on June 14, 2016.  (Docket # 32).  The government called Investigator Thomas Dorrer

("Dorrer") to testify.  Dorrer testified that he has been employed by the City of Rochester Fire

Department for approximately twenty-eight years and was currently assigned to the Arson Task

Force as a member of the fire investigation unit.  (Tr. 5).[2]  On January 18, 2015, at

approximately 7:00 a.m., Dorrer was notified that a fire had occurred at the Chili Express

Convenient store located at 989 Chili Avenue.  (Tr. 6).  According to Dorrer, he responded to the

scene at approximately 8:00 a.m. and learned that the fire was suspected to have been incendiary

in nature.  (Tr. 6-7).  Based upon information developed during the investigation, Dorrer drove

by Williams's girlfriend's house located on Hazelwood Terrace and observed a vehicle in the

driveway that matched the description of the vehicle captured on the surveillance footage.

(Tr. 29).

---

[2]   The transcript of the evidentiary hearing shall be referred to as "Tr."  (Docket # 32).

Sometime after 2:30 p.m. that afternoon, while Dorrer was at home and off-duty, MacKenzie called to inform him that Williams had been arrested in connection with a traffic stop. (Tr. 7, 29-30). According to Dorrer, he had not participated in Williams's arrest, although he knew that Williams had been a suspect in an investigation of an arson that had occurred at the same location two years earlier. (Tr. 7, 29). Dorrer testified that he did not know whether RPD had conducted surveillance on Williams or had coordinated the traffic stop in connection with the arson investigation. (Tr. 29-31). He also did not know whether MacKenzie had participated in the arrest of Williams. (Tr. 35-36).

After his arrest, Williams was transported to the Public Safety Building and placed in an interview room so that investigators could question him regarding the fire that had occurred the previous night. (Tr. 7-8, 31, 37). At that time, Williams was a suspect in the January 18, 2015 fire investigation. (Tr. 8, 28, 33-34, 37).

Dorrer testified that Williams was placed in the interview room at approximately 4:00 p.m., and Dorrer and MacKenzie entered the room at approximately 4:25 p.m. (Tr. 8-9, 27, 36; Government's Exhibit ("G. Ex.") 3). According to Dorrer, the interview room was approximately eight feet by eight feet with a single door and a metal table attached to the wall with three seats. (Tr. 9). Williams was not handcuffed when Dorrer entered the room. (*Id.*).

Dorrer testified that he commenced the interview by asking Williams some pedigree questions, including his name, date of birth, and address. (Tr. 10). According to Dorrer, Williams appeared to understand his questions and responded appropriately to them. (*Id.*). The interview was recorded, and a copy of the recording was entered into evidence. (Tr. 11-12; G. Ex. 1). The Court has reviewed relevant portions of the recording. (*Id.*). At some point, prior to the *Miranda* warnings, Dorrer said to Williams, in sum and substance, "We're

6

going to fill you in on everything.  It's no big deal right now."  (Tr. 43-44; G. Ex. 1).  According to Dorrer, he was attempting to minimize the seriousness of the subject in order to induce Williams to speak with the investigators.  (*Id.*).

According to Dorrer, he intended to question Williams about the fire, but first administered *Miranda* warnings from a standard *Miranda* card.  (Tr. 10-11).  Dorrer testified that he read the *Miranda* rights verbatim as they appeared on the card.[1]  (Tr. 12-13; G. Ex. 2).  According to Dorrer, after he read the first line on the *Miranda* card, Williams interrupted to ask, in sum and substance, "So you all arresting me?"  (Tr. 14, 38, 44-45; G. Ex. 1).  Dorrer testified that he and MacKenzie responded, "No"; he explained that Williams was not under arrest in connection with the arson, which was the subject of their questioning, even though he was under arrest for the felony traffic charge.  (Tr. 14, 45).  According to Dorrer, he had no involvement in Williams's arrest on the felony traffic charge.  (Tr. 14-15).  Dorrer also testified that Williams was booked on the traffic charge after the interview concluded, but he was not arrested that day on charges related to the arson.  (Tr. 15, 39).  Dorrer acknowledged that Williams was in custody and was not free to leave during the interview.  (Tr. 15, 37-39, 43).

According to Dorrer, he then read the next four lines from the notification card. (Tr. 15-16).  Dorrer then asked Williams whether he understood the rights, and Williams responded, "Um-hum," and nodded his head.  (Tr. 16-17).  Williams did not ask Dorrer to repeat

---

[1]  The Notification and Waiver Card provided:

1.  You have a right to remain silent - you do not have to say anything if you don't want to.
2.  That anything you do say can be used against you in a court of law.
3.  You have a right to talk to a lawyer before answering any questions and have him here with you.
4.  If you can't pay for a lawyer, one will be given to you before any questioning if you wish.
5.  If you do wish to talk with me, you can stop at any time.

(G. Ex. 2).

any of the rights or indicate that he did not understand his rights.  (*Id.*).  Additionally, Williams indicated that he was not under the influence of narcotics or alcohol, and he did not appear to be intoxicated or sick, according to Dorrer.  (Tr. 18-20).

Dorrer testified that they interviewed Williams for approximately seventy minutes and did not have difficulty understanding his responses.  (Tr. 18-19).  According to Dorrer, they questioned him regarding his whereabouts during the previous evening and confronted him when they believed he was not being truthful in his responses, although Dorrer testified that the interview was not "confrontational" in tone.  (Tr. 19-20).  At no time during the seventy-minute period did Williams indicate that he did not want to speak to the investigators.  (*Id.*).

According to Dorrer, after providing the *Miranda* warnings, the investigators told Williams that they wanted to talk to him about "something else"; the primary topic of the interview was the arson that had occurred at 989 Chili Avenue.  (Tr. 20, 47, 50; G. Ex. 1). Dorrer stated that the investigators were initially vague about the subject of the interview because they wanted Williams to provide information without knowing the precise nature of their investigation.  (Tr. 40, 47-48).  According to Dorrer, one of their initial goals was to determine Williams's location at approximately 3:00 a.m., when they believed the arson had been committed.  (Tr. 48).

After approximately seventy minutes, MacKenzie and Dorrer left the interview room in order to conduct research, review video surveillance, and travel to Williams's girlfriend's house in order to investigate Williams's account of his whereabouts the previous evening.  (Tr. 21, 23; G. Ex. 3).  Prior to leaving the interview room, the investigators offered Williams the opportunity to use the restroom and offered him something to eat and drink.  (*Id.*). Williams declined both offers.  (*Id.*).  According to Dorrer, he and MacKenzie returned to the

interview room approximately two hours later.  (Tr. 22-23; G. Ex. 3).  Dorrer testified that the investigators were in and out of the interview room over the next approximately five hours interviewing Williams and conducting research or reviewing surveillance footage to verify or refute the information provided by Williams.  (Tr. 24-26, 41; G. Ex. 3).

After the investigators returned to the interview room following the two-hour hiatus, they did not re-administer the *Miranda* warnings.  (Tr. 26).  According to Dorrer, at approximately 1:04 a.m., Williams became agitated and indicated that he wanted an attorney and to terminate the interview.  (*Id.*).  The investigators stopped questioning Williams, and he was subsequently booked for the traffic charges.  (Tr. 27, 41).  According to Dorrer, the investigators never threatened Williams or promised him leniency if he cooperated.  (Tr. 27-28).

### III.   Williams's Affidavit

Williams submitted an affidavit in support of his suppression motions.  (Docket # 24 at 15-16).  According to Williams, he was stopped by police officers on January 18, 2015, at approximately 2:00 p.m., while driving his girlfriend's SUV.  (*Id.*).  The officer informed him that he had failed to use a turn signal.  (*Id.*).  Williams stated that he was placed in a police vehicle and observed an officer search his girlfriend's vehicle.  (*Id.*).  He was subsequently transported to the Public Safety Building and placed in an interview room.  (*Id.*).

According to Williams, after a "long time," two officers entered the room to speak with him.  (*Id.*).  Williams recognized one of the officers as the individual who had conducted the search of the vehicle.  (*Id.*).  The officers informed Williams that they wanted to clear up another matter that was not related to the traffic stop, and they asked him questions relating to his address and other identifying information.  (*Id.*).  According to Williams, the

officers read him the *Miranda* rights, and Williams asked whether he was under arrest.  (*Id.*).

The officers said "no" and explained that they were reading the rights as a "formality," which

they would not need to do if they were talking in Williams's living room.  (*Id.*).  After the rights

were read, Williams spoke with the officers and answered their questions.  (*Id.*).

According to Williams, he did not understand his *Miranda* rights when they were

read to him, and he spoke with the officers without understanding his rights or the purpose of

their questioning.  (*Id.*).  Williams stated that he would not have spoken to the officer had he

understood that he was not required to do so.  (*Id.*).

## IV.   **The Videotape**

This Court has reviewed portions of the videotape recording of the investigators'

interactions with Williams in the interview room at the Public Safety Building on January 18,

2015.  (G. Ex. 1).  In relevant part, the recording depicts that the investigators entered the room

and introduced themselves to Williams by their first names.  Dorrer then asked Williams to

confirm his name, at which point he interjected to ask, "So what is this for?"  Dorrer responded,

"We are going to tell you everything" and began to ask pedigree questions.  During the pedigree

questioning, Dorrer again indicated, "Like I said, we are going to fill you in on everything.  It's

no big deal."  Following pedigree questioning, Dorrer began to administer *Miranda* warnings.

Williams interrupted to ask whether he was being arrested; Dorrer replied that he was not, and

MacKenzie replied, "No, not necessarily."  MacKenzie told Williams they were advising him of

his rights as a formality, which was necessary because of the location of the interview.  After the

rights advisement, Dorrer told Williams that there were "some things" they were trying to

"straighten out" concerning "something else."  Shortly thereafter, he stated that "something

happened on the westside . . . last night and a couple of times now."  After those comments, the investigators began to question Williams about his whereabouts the preceding night.

## DISCUSSION

### I.    Motion to Suppress Statements

Williams seeks to suppress the statements he made to Investigators Dorrer and MacKenzie on the grounds that they were obtained in violation of his *Miranda* rights and that they were not voluntarily made.  (Docket ## 24 at 6-7; 34).  Williams claims that although he was informed of his *Miranda* rights, he never explicitly waived them.  (Docket # 24 at 7).  He further maintains that any purported waiver and the statements themselves were not voluntary because he was not informed of the subject of the investigation before being questioned and because the investigators told him falsely that he was not under arrest.  (Docket # 34).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  Accordingly, "[e]ven absent the accused's invocation of [his rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement."  *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012).  To establish a valid waiver, the

government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In addition to establishing a valid waiver, the government must also establish that the defendant's statements were made voluntarily within the meaning of the Due Process Clause. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) (recognizing that there are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment").  In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993).  In evaluating the totality of the circumstances, the court must assess:  "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting

*United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, I find that Williams was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the investigators.  Specifically, Dorrer testified that he read aloud to Williams each of the *Miranda* warnings from a rights form and asked Williams whether he understood his rights.  Williams responded by stating, "Um-hum," and nodding his head.  Having reviewed the videotape recording of this portion of the interview, I find that Williams responded affirmatively when asked whether he understood his rights.  Moreover, after the rights were read to Williams, he never indicated that he did not understand his rights or that he did not wish to speak to the investigators; rather, he spoke with them and answered their questions, demonstrating a knowing waiver of his rights.  *See United States v. Cleveland*, 2013 WL 4759081, *9 (W.D.N.Y.) (finding waiver where defendant "was advised of his rights, stated that he understood his rights and agreed to speak with [the officers;] [s]uch facts establish that [defendant] knowingly and voluntarily waived his rights – whether he did so explicitly or implicitly"), *report and recommendation adopted*, 2013 WL 6440949 (W.D.N.Y. 2013).

Further, the credible testimony establishes that Williams's statements were not coerced.  As Dorrer acknowledged, the investigators were purposefully vague concerning the subject of their investigation – a strategy that they hoped would induce Williams to talk about his whereabouts the previous evening.  It is well-settled that law enforcement officers are not required to disclose the crime under investigation prior to interviewing a suspect.  *See Colorado v. Spring*, 479 U.S. 564, 577 (1987) ("the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature[;] [a]ccordingly, the failure

of law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner[;] . . . a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intentionally waived his Fifth Amendment privilege"); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) ("[s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless the defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead") (internal quotation omitted), *cert. denied*, 484 U.S. 1063 (1988); *United States v. Maney*, 2006 WL 3780813, *10 (W.D.N.Y. 2006) ("[defendant] points to no evidence that either agent affirmatively misrepresented the purposes of the interview when [defendant] was invited to attend or upon [defendant's] arrival at the outset of the interview itself[;] [a]dditionally, no caselaw supports the notion that a failure to reveal fully to the accused the interrogator's specific investigative objectives vitiates an otherwise valid waiver of *Miranda* rights or the voluntary nature of any subsequent questioning").  Further, as Williams concedes in his affidavit, the investigators informed him prior to beginning their questioning that they were interested in obtaining information concerning a subject unrelated to the traffic violation.  Specifically, they advised him that they wanted to question him about something that had occurred on the "westside" the previous night and "a couple [of] times" earlier.  *See United States v. Mitchell*, 2013 WL 6175849, *8 (W.D.N.Y. 2013) (defendant's statements were voluntary even though the agent used a ruse to obtain defendant's presence at the FBI; "[w]hile [the agent] did not specifically advise defendant that he employed a ruse to

14

obtain his presence . . . , at the outset of the interview defendant was advised that they were

'investigating another matter that they wanted to talk to [him] about'").

Dorrer acknowledged that, in order to induce Williams to speak more freely, the

investigators purposely sought to minimize the seriousness of the interview by, for example,

informing him that the interview was "no big deal right now."  When Williams asked whether he

was being arrested, the investigators responded that he was not because, as Dorrer testified, they

had not arrested and did not intend to arrest Williams on arson-related charges.  Dorrer's

rationale notwithstanding, his response to Williams's query certainly had the potential to lead

Williams to draw the wrong conclusion about the nature of the questioning.  At the time of

Williams's inquiry, he had not yet been told that the purpose of the investigators' meeting with

him was to question him about something other than the traffic offense.  The investigators'

assurance that he was not being arrested could have created the misrepresentation that the subject

of their interest was far less serious than it was.  Judged under relevant caselaw, however, I find

that the investigators' conduct was not sufficiently coercive as to render Williams's subsequent

waiver or statements involuntary.  *See United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992)

(defendants' statements voluntary even though agents emphasized their advisory role and

deemphasized of the criminal nature of the inquiry); *United States v. Hughes*, 640 F.3d 428, 439

(1st Cir. 2011) (defendant's statements were voluntary despite defendant's claim that the

troopers improperly led him to believe that he would not be arrested; "the key question is

whether the troopers' actions, viewed objectively, coerced the defendant into speaking[;]

[c]areful perscrutation of the record fails to disclose any extrinsic factors introduced by the

troopers that could have distorted the defendant's judgment about whether to speak freely to

them"); *United States v. Hutchinson*, 2013 WL 3938541, *12-13 (N.D. Ga. 2013) (officers'

statements designed to minimize seriousness of interview, including statements that they did not

think "it was that big of a deal" and that "it was not their purpose to lock him up" did not render

statements involuntary; "[t]o the extent the officers' attempts to downplay the significance of

[defendant's] statements amounted to trickery or deception, it is clear that the police's use of a

trick alone will not render a confession involuntary") (internal quotation omitted); *United States*

*v. Norrie*, 2013 WL 1285864, *20 (D. Vt. 2013) (federal agent's statements that defendant was

not under arrest despite knowledge that uniformed officers planned to arrest defendant on state

warrant following agent's interview did not render subsequent statements involuntary; "[a]s for

the critical element of police overreaching, the only evidence [d]efendant points to is [the

agent's] statement that he . . . [was] not prepared to arrest [d]efendant and . . . that he was not

there to discuss [another agent's investigation;] [t]he court has already concluded that these

statements do not rise to the level of affirmative misrepresentations, and concludes now that they

do not constitute police overreaching; . . . [i]ndeed, [the] [d]efendant fails to point to *any*

evidence that he was *compelled* to make statements because he either did not believe he would

be arrested or because he believed [the] [a]gent['s] investigation would not be the subject of

inquiry"); *United States v. Perry*, 2012 WL 447311, *2 (E.D. Mo. 2012) ("even if [the agent] had

falsely stated to [d]efendant that the targets of their investigation were other individuals, and that

[d]efendant was not the target, on these facts, [d]efendant's will was not overborne and any such

representations would not be sufficient to require a suppression of [d]efendant's statements),

*aff'd*, 714 F.3d 570 (8th Cir. 2013); *United States v. Gatherum*, 2007 WL 4788472, *9, 13 (S.D.

W. Va. 2007) (defendant's statements voluntary despite officer's statement that defendant was

not under arrest and free to leave even though officer had five arrest warrants at time of

interview that he executed at conclusion of interview), *report and recommendation adopted*,

16

2008 WL 200312 (S.D. W.Va. 2008); *aff'd*, 338 F. App'x 271 (4th Cir.), *cert. denied*, 558 U.S. 1083 (2009).

Williams's attempt to distinguish *Colorado v. Spring*, 479 U.S. 564 (1987), is unpersuasive.  (Docket # 34 at 6-7).  Williams maintains that *Spring* is inapposite because the arrest in this case was a pretextual ploy designed to create an opportunity for an interrogation. (*Id.*).  Despite that contention, Williams does not challenge the validity of the arrest.  *See Whren v. United States*, 517 U.S. 806, 812-13 (1996) ("[w]e flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification[;] . . . the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved") (citations omitted); *United States v. Tisdol*, 290 F. App'x 384, 386 (2d Cir. 2008) ("[t]o the extent [defendant] argues that the pretextual use of a traffic violation to stop the cab compelled suppression of the drugs seized from him, the law is to the contrary").  Even assuming that his arrest had been coordinated with the arson investigators, the record demonstrates that Williams was advised before he was questioned that the questioning concerned a matter unrelated to the traffic offense.

Considering the totality of the circumstances, I conclude that Williams voluntarily waived his rights and spoke with the investigators.  Nothing in the record suggests that Williams's age or characteristics rendered him particularly vulnerable to coercion or that he was intoxicated, sick, or in pain.  In fact, Williams denied being under the influence of any substances.  Second, Dorrer testified that neither he nor any other officer made any promises to or threatened Williams in order to induce him to speak.  Further, Williams's general demeanor during the interview did not suggest any significant emotional distress.

Nor were the other circumstances of the interview overbearing within the meaning of the Due Process Clause.  Although Williams was in the interview room for more than eight hours (Tr. 4)[2], he was not handcuffed and was offered opportunities to eat, drink, and use the restroom.  Indeed, Williams himself terminated the interview and invoked his right to an attorney, suggesting that he understood his rights and how to invoke them.  *See United States v. Ardito*, 2009 WL 161236, *5 (D. Minn. 2009) ("the fact that the [d]efendant invoked his right to counsel demonstrates that he understood his rights, and appreciated that he could fully exercise those rights").  On the record before me, I conclude that Williams's waiver was knowing and voluntary and that his subsequent statements were voluntary and free from undue coercion.  Accordingly, I recommend that the district court deny Williams's motion to suppress statements.

## II.    Motion to Suppress Evidence

I turn next to Williams's motion to suppress evidence seized from the 2004 Chevrolet Trailblazer pursuant to the warrant dated January 20, 2015.  (Docket # 24 at 7-9).  Williams maintains that prior to applying for the warrant, the vehicle was unlawfully searched during the course of the traffic stop.  (*Id.*).  Anticipating that the government would seek to rely upon the subsequently issued warrant, Williams maintains the search warrant was based upon observations made during the unlawful initial search of the vehicle, and thus was not independent of the unlawful search.  (*Id.*).

---

[2]  Williams has not taken the position that the length of the interview alone rendered his statements involuntary.  Although Williams was in the interview room for approximately eight hours, he was interrogated intermittently during that time.  *See United States v. Smith*, 2015 WL 7177190, *7 n.4 (E.D.N.Y. 2015) ("although the defendant remained in [the interview room] for several hours, the length of each of his individual interviews does not give rise to any presumption of coercion") (collecting cases).  In any event, "the length of the defendant's interrogation is but one piece of a much larger 'totality of the circumstances' analysis that alone is not dispositive of whether the defendant's statements . . . were voluntary."  *See id.*

The government has elected, for the purposes of this motion, not to litigate the validity of the search.[3]  (Docket # 26 at 5-8).  Rather, the government urges that if the observations made during the course of the pre-warrant search of the vehicle are excised from the supporting affidavit, the remaining allegations in the affidavit are sufficient to establish probable cause to support the warrant.  (*Id.*).

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search."  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal citations omitted); *see Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).  This doctrine applies not only to direct evidence, but also to tangible and testimonial evidence derived from the tainted evidence "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. at 537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Under the independent source doctrine, evidence originally discovered by illegal means but later seized pursuant to lawful means will not be suppressed.  *Murray*, 487 U.S. at 542; *see also United States v. Johnson*, 994 F.2d 980, 987 (2d Cir.) ("[c]ourts have applied the independent source exception in cases where the police stumble upon evidence while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue"), *cert. denied*, 510 U.S. 959 (1993); *United States v. O'Brien*, 498 F. Supp. 2d 520, 540 (N.D.N.Y. 2007) ("[i]f police seize evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier Fourth Amendment

---

[3]  The government's papers nonetheless assert that the pre-warrant vehicle search was lawful.  (Docket # 26 at 6).

19

violation, there is an independent source for the seizure, and the evidence is untainted and admissible"), *aff'd*, 303 F. App'x 948 (2d Cir. 2008).  The independent source exception requires proof that:  "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." *United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. 2010) (citing *United States v. Johnson*, 994 F.2d at 987).

MacKenzie's affidavit included observations of a small red gas can that he saw in the rear cargo area of the vehicle during the course of his initial search of the vehicle.  (Docket # 24 at 24).  Yet, "'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant'[;] . . . [r]ather, a reviewing court 'should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" *United States v. Ahmad*, 2012 WL 1944615, *6 (W.D.N.Y.) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)), *report and recommendation adopted*, 2012 WL 3028302 (W.D.N.Y. 2012).  Thus, the salient question is whether, excising the observations made during the initial search of the vehicle, the remaining allegations in the application are sufficient to establish probable cause to support the warrant.  I conclude that they are.

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer

must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

MacKenzie's affidavit described the surveillance footage from the January 18, 2015, incident, which depicted the presence of a white SUV with unusual characteristics (a black hood and missing gas door) in the vicinity of the building where the arson occurred.  According to MacKenzie, the footage also depicted the perpetrator of the arson entering and exiting the frame of the surveillance camera from the direction that the vehicle had traveled.  MacKenzie further reported that investigation into the vehicle's license plate number revealed that the vehicle was registered to Blandino, who was known to be involved with Williams.  Indeed, a police report revealed that during a prior traffic stop of the vehicle, Williams had been identified as a passenger and the vehicle had been described as missing its "gas cap."

MacKenzie's affidavit also noted that an investigation of a previous arson at the same location suggested the involvement of both Williams and a vehicle owned by Blandino. Finally, the affidavit described MacKenzie's observations later in the afternoon of January 18,

2015, of a white vehicle with the unusual characteristics depicted on the surveillance footage in Blandino's driveway.  I easily conclude that these allegations, taken together, provide adequate probable cause to support the warrant for a search of the vehicle.[4]

Concluding that the first requirement of the independent source doctrine is met does not end the inquiry.  I must also consider whether the investigating officers would have applied for a warrant in the absence of the observations made during the pre-warrant vehicle search.  *See United States v. Bonczek*, 391 F. App'x at 24 (second prong of the independent source inquiry is whether the decision to seek the warrant was "prompted by information gleaned from the illegal conduct") (internal quotations omitted).  In its submission, the government did not acknowledge this prong of the inquiry, and I conclude that the record would benefit from further development on this issue.  Accordingly, a further evidentiary hearing shall be conducted in order to address the issue of whether the investigating officers would have applied for a warrant in the absence of the pre-warrant search.  Such a hearing shall be conducted on **November 17, 2016,** at **2:00 p.m.**

---

[4] MacKenzie's affidavit also recounts statements made by Williams after the traffic stop and the initial search of the vehicle.  Although it is unclear whether Williams maintains that his statements were tainted by the vehicle search (Docket # 24 at 6-8), that question need not be resolved because the allegations in the affidavit relating to the observations and investigation that occurred prior to the traffic stop establish sufficient probable cause to support a warrant for the vehicle.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny Williams's motion to suppress statements.  (Docket # 24).  As to Williams's motion to suppress physical evidence, a further evidentiary hearing shall be conducted on **November 17, 2016**, at **2:00 p.m.**


*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      October 26, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      October 26, 2016

---

[5]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).